# CHARLESTON.

DAVIS SEWING MACHINE CO. *v.* DUNBAR *et al.*

Submitted January 27, 1887—Decided April 9, 1887.

FRAUDULENT CONVEYANCE.

A sewing machine company by its agent on March 19, 1884, made a contract with T. J. D. to sell sewing machines for it; and J. V. D., the father, gave a guaranty, that the son would faithfully pay all sums, which he might owe under said contract; and the father and his sons, T. J. D. and J. T. D., represented, that the father was solvent and owned ninety four acres of land. The father had in 1881 made and delivered a deed for this land to said two sons, which deed was never recorded. After the above contract was made, the father and the two sons agreed, that the deed should be made for the land to J. T. D., which was done, and the deed was placed on record the day before the son, T. J. D., entered upon his duties under the contract. The said T. J. D. became indebted soon after to the company in a large sum of money and then became insolvent. Upon bill filed to subject said land to the payment of the debt, HELD :

Under the circumstances of the case the scheme was to defraud the plaintiff; and the ninety four acres of land should be subjected to the payment of the debt.

*Levin Smith* for plaintiff in error.

*Loomis & Tavenner* for defendant in error.

JOHNSON, PRESIDENT :

This is a suit in chancery brought in the Circuit Court of Wood county to set aside a deed for fraud and subject the land conveyed to the payment of the plaintiff's claim. The bill was filed in the Circuit Court of said county at September rules, 1885. The bill alleges, that the plaintiff is a corporation created and existing under the laws of New York; that on the 19th day of March, 1884, it entered into a contract with the defendant, T. J. Dunbar, whereby said corporation contracted to sell sewing machines to said Dunbar on certain terms, according to which they were to be paid for. The contract is exhibited with the bill and is in substance as follows :—First—that machines and other property would be

78

packed for transportation and delivered in good order to the transportation-company in Cleveland, Ohio, by the machine-company, after which all expenses of every kind should be paid by said T. J. Dunbar;—second—that said party of the second part should reasonably advertise and introduce, supply and sell all machines as speedily, thoroughly and extensively as practicable throughout Kanawha and Fayette counties, West Virginia, or such territory, as may hereafter be agreed upon between the parties;—third—said sewing machine company will sell its machines and attachments to said party of the second part at such prices and on such terms, as are herein named or may hereafter be agreed upon between the parties. Prices were agreed upon (including attachments named) and are given. A number of other provisions not necessary to mention were included in the contract.

The bill further alleges, that on the same day, the 19th of March, 1884, John V. Dunbar, now deceased, by his writing under seal guaranteed to the plaintiff the payment by T. J. Dunbar of all the indebtedness then existing, or that should thereafter be incurred by said T. J. Dunbar under said contract. The guarantee is also exhibited. The bill also alleges, that on the 6th day of June, 1884, said T. J. Dunbar being indebted to the plaintiff under said contract in the sum of $250.19 executed to the plaintiff his negotiable promissory note, dated at Pomeroy, Ohio, whereby six months after the date thereof, he promised to pay the plaintiff the sum aforesaid; and on the 21st day of June, 1884, being indebted under said contract in the further sum of $245.50 executed another note for that sum payable to the plaintiff six months after date;—that neither of said notes nor any part of either has ever been paid by said T. J. Dunbar or J. V. Dunbar or either of them;—that T. J. Dunbar has no property real or personal, out of which the debt can be made;—that before accepting said J. V. Dunbar as guarantor said Dunbar represented himself to him to be the owner of ninety four acres of land in Clay district, and that there was no incumbrance upon the land;—that not till then did the plaintiff consent to enter into the contract with T. J. Dunbar, whereby he was made agent to sell the plaintiff's ma-

chines;—that not satisfied with the assurance of T. J. Dun-
bar and his father in regard to the said land plaintiff em-
ployed the clerk of the County Court of Wood county, where
the land was situated, to examine the title thereto and as-
certain, whether there were any liens on the land. The said
clerk certified, that John V. Dunbar was taxed on two
tracts of land aggregating ninety four acres, and that there
were no encumbrances on said land;—that after this, to wit,
on the 2d day of June, 1884, there was admitted to record in
the county of Wood a certain deed purporting to have been
made by the said John V. Dunbar on the 11th day of July,
1881, whereby he conveyed all his interest in said land to
his son, J. T. Dunbar. This deed is exhibited with the bill.

The bill charges, that this deed was really not made till
after the contract of suretyship, and that it was ante-dated,
in order that said John V. Dunbar's estate might not be
charged with any debt or debts to the plaintiff, which might
arise or might have arisen out of the contract with T. J-
Dunbar, and was made to hinder, delay and defraud the
creditors of said John V. Dunbar;—that even if said deed
was made on the 11th day of July, 1881, said J. T. Dunbar
has committed a fraud by secreting the same from that day
to the 2d of June, 1884, and thus giving J. V. Dunbar an op-
portunity to obtain credit on the reputed ownership of said
land, and that the land is therefore liable to J. V. Dunbar's
obligations;—that besides the ninety four acres of land J. V.
Dunbar, now deceased, owned no property at the time of
his death;—that said T. J. Dunbar and J. T. Dunbar, and
the other heirs of J. V. Dunbar, deceased, as well as the ad-
ministrator of the estate of the said Dunbar are made de-
fendants. The prayer of the bill is, that said deed may be
held fraudulent, and the said land subjected to the payment
of the plaintiff's claim.

James T. Dunbar answered the bill denying, that he had
any knowledge of the contract alleged to have been made
between the plaintiff and T. J. Dunbar or of the alleged guar-
antee of J. V. Dunbar;—that there was any conversation
with T. J. Dunbar or J. V. Dunbar or either of them as stated
in the bill;—that he made any statement, as set out in the
bill;—that the deed recorded June 2, 1884, was either execu-

ted or ante-dated, in order that J. V. Dunbar's estate might not be charged with his debts arising out of the contract with T. J. Dunbar;—that it was made to hinder, delay and defraud the creditors of said J. V. Dunbar or the complainant. He avers, that on the 11th day of July, 1881, J. V. Dunbar was growing old, had lost his wife, had no family and was considerably indebted to various parties—among others to T. J. Dunbar for work and labor done at the request of said J. V. Dunbar, and to respondent for money paid for his benefit, amounting to at least $300.00 to both;—that in consideration that respondent and T. J. Dunbar would pay off and settle the indebtedness of the said J. V. Dunbar then existing and furnish him a comfortable support, *etc.*, for life and in further consideration of his said indebtedness to said respondent and T. J. Dunbar the said John V.—"agreed to sell and convey to said respondent and said T. J. Dunbar the said tracts of land;"—that afterwards T. J. Dunbar seemed to grow dissatisfied with said agreement and agreed, if respondent would release him therefrom and himself carry out its provisions and pay him (T. J.) $300.00, he (T. J.) would assign and release unto respondent his interest under said agreement in said property, and in consideration of $150.00 more would sell respondent a valuable horse;—that said agreement with T. J. Dunbar was made about the first of February, 1884, and *was complied with shortly thereafter;* that after making said agreement this respondent realizing the fact, that his father was growing old requested him to, and he did, execute a deed for said property (the same deed exhibited with the bill);—*that the deed was executed on the 2d day of June,* 1884, and was on that day admitted to record;—that it was dated on the 11th day of July, 1881, *because that was the date, at which the same had been agreed by him to be executed, and because the consideration had already been paid in part as of that date;*—that about the 1st of July, 1883, he informed Hanley, the agent of the plaintiff, that the lands did not belong to J. V. Dunbar, and explained to him the agreement between his father and himself and T. J. Dunbar;—that he told said Handley, that, if T. J. wanted to take an agency for selling sewing machines, he would buy out his interest in the land and give him means to help him in the

enterprise.  He denies, that he secreted the deed, and avers, that, when he accepted the deed of June 2, 1884, *he did not know the bond of his father to said plaintiff had been executed*, nor until he paid or secured the money for his brother's interest.—He further avers, "that since the — day of ——, 1881, when he purchased said land of J. V. Dunbar, he has been in possession, use and enjoyment of said land as his own, has so treated and regarded it, paid taxes thereon and never heard of any objection thereto or denial of his ownership of the same.

T. J. Dunbar answered the bill, and in his answer does not deny his insolvency, admits the indebtedness charged in the bill, and that the notes have not been paid, avers, that he told Handley, the agent of the plaintiff, that the land did not belong to John V. Dunbar nor to himself, and explained to him, that there was an agreement between J. T. Dunbar and J. V. Dunbar, whereby said J. V. was to convey the land to J. T. Dunbar; but that, if that would do, he would get the said J. V. Dunbar to join in the bond, and denies, that he ever represented said J. V. to be the owner of the land, or that plaintiff or any of his agents ever had an interview with said J. V. Dunbar to ascertain, if he was willing to become surety, or that said J. V. Dunbar ever represented himself to be the owner of said land, and that there were no incumbrances on it.  As to the execution of the deed of June 2, 1884, he knew nothing except the fact, that " about the 1st of July, 1881, the said J. V. Dunbar had *verbally* agreed with this respondent and said James T. Dunbar, to both of whom he was indebted in about the sum of $300.00 each, that, if they would accept said ninety four acres of land in payment of said indebtedness and would also furnish said John V. with a comfortable support, with food, clothing, comfortable lodging and shelter and all needed medical attendance, and whatever might be necessary to a comfortable and respectable living during his life, he would sell and convey to them the said land.  He avers, that in 1883 Handley first spoke to respondent in regard to the venture in the business of selling machines, and that at that time said Handley, agent as aforesaid, was duly informed as to the title to said land and the agreement, under which the

same was held. Respondent further says, that afterwards, to wit, in the early part of 1884 respondent agreed with said J. T. Dunbar, that, if he would relieve him from the agreement with said John V. and would pay him the sum of $300.00, which it was agreed was justly due for service performed for said John V. and would pay him the additional sum of $150.00, respondent would release unto him, the said J. T., all his interest in said land and a valuable horse;—that said John V. was consulted, and with his approval it was so agreed;—that of this agreement said Handley had due notice and was informed, that respondent got the money, with which to undertake this business, from that source. Respondent further says, that no memorandum in writing was made of said agreement in 1881 or signed by the party to be bound thereby, and it was understood to be unnecessary for respondent to join in said deed of June 2d, 1884.

A number of other defendants answered disclaiming any interest in the land sought to be subjected; depositions were taken; and on the 6th day of March, 1886, the case was finally heard, and the bill was dismissed with costs. From this decree the plaintiff appealed.

Did the court err in dismissing the plaintiff's bill? The law in this State, as to how fraud may be proved, and as to the quantity of proof necessary to sustain the charge of fraud, is well settled. It may be proved, as anything else is proved, by facts and circumstances. The evidence may be either positive or circumstantial; and it often occurs, that the circumstantial evidence to sustain the charge will sweep away the positive testimony of many witnesses swearing, that no fraud was intended. The rules of law, as laid down in our Court from *Lockhard* v. *Beckley*, 10 W. Va. 87, and *Hunter* v. *Hunter*, Id. 321, to *Burt* v. *Timmons* (decided at this term) *supra*, p. 441, are set forth in the syllabus of the last named case.

It is here insisted, that, though one witness swears to facts, which, if true, prove the fraud, the case fails, because two or three witnesses depose to a contrary state of facts. Which is to be believed depends upon the other facts and circumstances in the case. David Handley, the agent of the plain-

tiff, who for his principal made the contract, tells in his deposition a straightforward story. It is true, he is a sewing machine agent; but notwithstanding the facetious statement in the brief of counsel for appellees, that "in the earlier works on evidence treating of the credibility, character, infamy and general truthfulness of witnesses, it is true, that sewing-machine agents, lightning rod and patent-right peddlers are not specifically named as *prima facie* unworthy of belief; but, it must be remembered, these are avocations of comparatively recent origin and were unknown to and never dreamed of by writers of old standard works on evidence" we are compelled to look at his testimony together with the other facts and circumstances in the case, in order to determine, whether his story is probable or concocted by him to save a claim to his principal; and whether if corroborated by the circumstances of the case his testimony is to be overthrown by the conflicting positive testimony of two interested witnesses.

Handley says, he made the contract for his company with T. J. Dunbar; that his company required security from every agent, then he would account to the company for all money received by him from the sale of machines placed in his hands; that John V. Dunbar was proffered as security; that said John V. Dunbar represented to him, that he owned the ninety four acres of land, on which he lived with his two sons, T. J. and J. T. Dunbar, and that there were no incumbrances on it; and that he took him as security for his son, T. J. Dunbar, with whom the contract was made. He also says, that the defendants, T. J. Dunbar and J. T. Dunbar, both represented to him, that their father owned the land, and that they never told him the contrary; that a short time afterwards he employed the clerk of the County Court of Wood county to examine the title to said land and found the title to be in John V. Dunbar. All this is denied by both Thomas and James Dunbar, who both testify, that they told him, the title was not in their father, and notified him, that they owned the land.

Now let us see, how, they say, they owned the land, and what they told Handley, if their statements are to be believed. J. T. Dunbar, who now claims the land, says in his answer, John V. Dunbar " *agreed to sell and convey to said*

*respondent and said T. J. Dunbar the said tract of land."* Whether this contract was in writing or oral, he does not state in his answer. In his deposition he says in answer to the question—" Was there any memorandum in writing signed by your father of the contract for the sale of the farm to yourself and your brother Thomas in the spring of 1881 ?"—" Nothing but a deed, that I know of. " He further says, that his father wrote the deed and signed it and then put it into his bureau drawer; and that he had it in Parkersburg a short time before. Directly afterwards he says, that his father delivered the deed to him, after it was written, with the consent of his brother Thomas. This he said in his cross-examination, while in his direct examination he said after saying, that he sold the land to his father for a thousand dollars, that a short time afterwards " there was another arrangement between my father and I and T. J. Dunbar. We were to take care of him during his natural lifetime and to pay off what debts and liabilities were against him up to July 1, 1881. *There was a deed written, but there was never anything done with it. It was neither acknowledged nor delivered.* " He says he told Handley, that " Thomas and I had the place together under a contract from my father ; and that, if he wanted to go into the machine-business, I would buy his interest in the farm and give him the money for it, which I thought would be as much as he would need. "

T. J. Dunbar in his answer says, that Handley "was duly informed of the title to the said land and the agreement, under which the same was held."—He says concerning said agreement :—" About the 1st of July, 1881, the said John V. had verbally agreed with this respondent and said James T. Dunbar "—for certain considerations,—" that he would sell and convey to them the said ninety four acres of land. " He further says, that " *no memorandum in writing had ever been made of said agreement in 1881, or signed by the party to be bound thereby; and it was understood, it was not necessary for respondent to join in said deed of June 2, 1884.* "

This is what these two witnesses say about their title to the land, notice of which, they say, they brought home to the agent of the plaintiff.

The authorities, which counsel for appellees cite in support of the position, that possession is notice, have no application here, because John V. Dunbar, in whose name the title appears on the record of deeds of Wood county, was living in the house on the premises with his son James, and Thomas also lived there; and it would from external appearances be difficult to say whether the father was living with his son James, or James and his family were living with his father. Every man is presumed to know the law, and if under such circumstance the contract, they referred to, was a mere verbal one, as these two say it was, then it was void under the statute of frauds.

The whole defence has the appearance of being an afterthought. It turns out on the cross-examination of James T. Dunbar after he had said, that the deed was never acknowledged or *delivered*, that he had it in his possession, and on being pressed he exhibits it; and it is found to bear date the 11th day of July, 1881, and to be signed by John V. and also by James and Thomas. In it is the following language :— " The further consideration for the property herein conveyed is that the parties of the second part agree to pay off and discharge all debts and liabilities now existing against and owing by the said John V. Dunbar, and they further agree to furnish the said John V. Dunbar with a comfortable support, with food and clothing, comfortable lodging and shelter and all needed medical attendance, and whatever may be necessary to a comfortable and respectable living during his life." In the answer of James T. Dunbar, speaking of the verbal contract, he says it was agreed, they should " furnish the said John V. Dunbar with a comfortable support, with food and clothing, comfortable lodging and shelter and all needed medical attendance, and whatever might be necessary to a comfortable living during his life." In T. J. Dunbar's answer the same thing is thus stated :—" furnish said John V. Dunbar with a comfortable support, with food and clothing, comfortable lodging and shelter and all needed medical attendance, and whatever might be necessary to a comfortable and respectable living during his life." This same Thomas says in his answer, that no memorandum in writing had ever been made of said agreement of 1881 or signed by the

79

party to be bound thereby, and it was understood it was not necessary for respondent to join in said deed of June 2, 1884. T. J. Dunbar in his deposition said, that there was a deed written, but there never was anything done with it. It was neither acknowledged nor delivered. What a coincidence! Here according to these two defendants and witnesses, so much relied upon by counsel for appellees, was a verbal contract made more than three years before, and they tell their counsel its contents and not only agree precisely in the form of words used in the deed afterwards *dragged* out of one of them, but also exactly agree with each other as to the precise form of words used in the verbal contract.

This stamps these two witnesses as false; and if ever the maxim—*"falsus in uno falsus in omnibus,"* can apply, it seems to me, it must apply here. The scheme is apparent. They would by their false defence avoid the assertion of any reason, why J. T. Dunbar might not through the deed of June 2, 1884, acquire a perfect legal title to the lands and then by swearing that Handley, the agent of the plaintiff, had full notice of a *contract*, which showed, that the father did not own the land, thus prove that no fraud was practiced. These defendants must have deceived their counsel. They must have had access to the deed and committed to memory the words quoted and given them to their counsel when the answers were written. Their evident object was to show, that there was no impediment in the way of the execution of the deed of June 2, 1884, and thus to try to show, that the plaintiff had been fairly and honorably dealt with, when by the whole record it is irresistibly forced upon my mind, that their scheme had been to make the agent believe, that the land belonged to their father, get him on the bond and keep the land themselves. The deed of June 2, 1882, is clearly fraudulent and void as to plaintiff. The fixing up of this deed under the circumstances, the grantee J. T. Dunbar, trying by his testimony to show, that it was made before the contract and recorded before any machines were delivered to his brother, and recorded the very day before his brother went to Pomeroy to engage in business under his contract with the plaintiff—all shows to my mind, that the clear intent of John V., J. T., and T. J. Dunbar was to defraud the

plaintiff by making it impossible for him to hold the said land responsible under the contract of J. V. Dunbar. Thomas and James both participated in this fraud. This to my mind is clear. They both deceived the agent of the plaintiff into accepting John V. Dunbar as surety for the faithful performance of the contract of Thomas by representing the said land to be the property of said John V., and can not now be permitted to reap the benefit of their fraud by retaining the land.

The decree of the Circuit Court of Wood county is reversed, and the cause remanded with instructions to enter a decree declaring said deed fraudulent as to plaintiff's demand for the amount of its claim against T. J. Dunbar and the estate of John V. Dunbar, deceased, and giving a day for the payment thereof, and in default of payment to sell said land for the payment of said claim.

REVERSED. REMANDED.